1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    DAMIEN MARSHJON MCDOUGLAND,          No.  2:22-cv-02242 SCR P

12                Plaintiff,

13         v.                              ORDER AND FINDINGS &
                                           RECOMMENDATIONS
14    J. BELLUOMINI, et al.,

15                Defendants.

16

17         Plaintiff is incarcerated in state prison and proceeding pro se and in forma pauperis with

18   this civil rights action under 42 U.S.C. § 1983.  All eighteen defendants have moved for summary

19   judgment.  (ECF No. 57.)  For the reasons set forth below, the undersigned recommends

20   defendants' motion be GRANTED IN PART and DENIED IN PART as follows:

21        1.  Summary judgment should be GRANTED to defendants Belluomini, Bunch, Castille,

22   Dennis, McElroy, Priest, Purtle, Williams, and Bargstadt on plaintiff's Eighth Amendment

23   excessive force claim;

24        2.  Summary judgment should be DENIED to defendants Strope and Branion on plaintiff's

25   Eighth Amendment excessive force claim; and

26        3.  Summary judgment should be GRANTED to defendants Abraham, Arciga, Farhat, Reyes,

27   Thomas, and Sarai on plaintiff's Eighth Amendment failure-to-intervene claim.

28   /////

                                           1

1                               **PROCEDURAL BACKGROUND**

2            The action is proceeding on plaintiff's complaint filed on December 14, 2022. (ECF No.

3 1.) The complaint alleged Eighth Amendment violations by prison officials and medical staff

4 arising out of an incident on September 14, 2020, while plaintiff was incarcerated at the

5 California Health Care Facility ("CHCF"). Plaintiff claimed he was assaulted by several

6 defendants and that other defendants failed to intervene or provide necessary medical care. (Id.)

7            The previously assigned magistrate screened the complaint under 28 U.S.C. § 1915A and

8 determined it stated cognizable excessive force claims against defendants Belluomini, Bargstadt,

9 Branion, Bunch, Castille, Dennis, McElroy, Priest, Purtle, Strope, and Williams, and cognizable

10 failure-to-intervene claims against defendants Arciga, Abraham, Reyes, Thomas, Farhat, and

11 Sarai. (ECF No. 15.) Given the choice to amend or proceed on his cognizable claims, plaintiff

12 elected to proceed on the complaint as screened. (ECF No. 19.)

13                   **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

14      **I.**     **Defendants' Motion and Evidence**

15         **A. Eighth Amendment Excessive Force**

16            Defendants move for summary judgment on plaintiff's excessive force claim on four

17 grounds: (1) the claim against defendant Strope is barred by Heck v. Humphrey, 512 U.S. 477

18 (1994) ("Heck"); (2) Defendants Belluomini, Bunch, Castille, Dennis, McElroy, Priest, and

19 Purtle, are entitled to summary judgment on the excessive force claims as the undisputed facts

20 show that they did not use any force on plaintiff; (3) Plaintiff's allegations that defendant

21 Williams overly tightened his handcuffs and twisted his fingers and wrist, which caused no

22 serious injury, does not rise to an Eighth Amendment violation; and (4) Defendants Bargstadt,

23 Branion, and Strope, are entitled to summary judgment because the undisputed facts show that

24 their use of force was not excessive. (ECF No. 57 at 1-2.) In the alternative, defendants

25 Bargstadt, Belluomini, Branion, Bunch, Castille, Dennis, McElroy, Strope, Priest, Purtle, and

26 Williams assert that they are entitled to qualified immunity. (ECF No. 57-1 at 26-28.)

27         **B. Eighth Amendment Failure to Intervene**

28            Defendants move for summary judgment on plaintiff's failure-to-intervene claim on the

1   following grounds: (1) plaintiff failed to exhaust available administrative remedies on this claim

2   before filing suit; (2) the undisputed facts do not show a cognizable failure-to-intervene claim as

3   the defendants did not have a reasonable opportunity to intervene; and (3) because plaintiff's

4   theory that defendants could have stopped the assault by pressing an alarm is implausible.  (ECF

5   No. 57 at 1-2.)  In the alternative, defendants Abraham, Arciga, Farhat, Reyes, Thomas, and Sarai

6   maintain they are entitled to qualified immunity because it was not clearly established that failure

7   to activate an alarm is a violation of the Eighth Amendment.  (ECF No. 57-1 at 25-26.)

8       **II.    Plaintiff's Response**

9       Plaintiff did not timely oppose defendants' motion.  On May 29, 2025, the undersigned

10  issued an order to show cause directing plaintiff to file, within 21 days, a response to defendants'

11  motion that complies with Federal Rule of Civil Procedure 56 and Local Rule 260.  (ECF No.

12  58.)  Plaintiff filed a response in which he explained that he does not know how to litigate this

13  case and previously requested the appointment of counsel.[1]  (ECF No. 59.)  Plaintiff did not

14  submit any evidence in opposition to defendants' motion but stated that he has "plenty of

15  evidence of defendants' staff assault" that he will show at trial.  (Id.)  Defendants filed a reply

16  asking the court to grant their motion and dismiss the case. (ECF No. 60.)

17      On June 27, 2025, the undersigned sua sponte granted plaintiff an additional 30 days to

18  respond to defendants' motion.  (ECF No. 61.)  In the order, the undersigned explained that there

19  will be no trial if defendants' motion for summary judgment is granted and instructed plaintiff to

20  review the Rand notice in its entirety.  The undersigned also instructed plaintiff to submit an

21  opposition that complies with Federal Rule of Civil Procedure 56 and Local Rule 260 and advised

22  him that his failure to file an opposition to defendants' motion "may be deemed a waiver of any

23  opposition to the granting of the motion" under Local Rule 230(l).  (Id. at 2.)  Plaintiff did not file

24  an opposition within the time provided or otherwise respond to the order.

---

[1]  Plaintiff has filed four unsuccessful motions to appoint counsel over the course of the
proceedings.  In response to his last motion (ECF No. 50), the undersigned invited both parties to
submit briefs addressing the existence of any exceptional circumstances or due process concerns
that warrant the appointment of voluntary counsel.  (ECF No. 51.)  In response, plaintiff again
cited only his lack of a legal education.  (ECF No. 53.)  Finding no due process justifications or
exceptional circumstances present, the undersigned denied the motion.  (ECF No. 55.)

Plaintiff's failure to oppose is not grounds to automatically grant defendants' motion. Heinemann v. Satterberg, 731 F.3d 914, 917 (9th Cir. 2013) ("[A] motion for summary judgment may not be granted based on a failure to file an opposition to the motion[.]"); see also Adv. Comm. Note to 2010 Amendments to Fed. R. Civ. P. 56(e) ("[S]ummary judgment cannot be granted by default even if there is a complete failure to respond to the motion[.]").  Rather, because plaintiff is proceeding pro se, the undersigned will consider the entire record before granting summary judgment against him.  See Adv. Comm. Note to 2010 Amendments to Fed. R. Civ. P. 56(e)(4) ("[T]he court may seek to reassure itself by some examination of the record before granting summary judgment against a pro se litigant.").  The court will consider whether plaintiff's complaint, other verified filings, and deposition can serve as opposing affidavits:

> [B]ecause [the plaintiff] is pro se, we must consider as evidence in his opposition to summary judgment all of [his] contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the plaintiff] attested under penalty of perjury that the contents of the motions or pleadings are true and correct.

Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004); see also Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003) (reversing grant of summary judgment to defendants where district court failed to credit genuine issues of material fact raised in plaintiff's deposition testimony).

### III.   Material Facts

#### A.  Incident on September 14, 2020

On September 14, 2020, plaintiff was housed at CHCF in Unit C2B, Cell No. 114. (Defendants' Statement of Undisputed Facts ("SUFs") 1, 2.)  At approximately 1:40 p.m., Registered Nurse Mageria was with plaintiff to change the dressing on a bed sore on his buttock. Plaintiff was dissatisfied with how Mageria was handling his dressing change.  (SUF 3.)  At approximately 1:53 p.m., Mageria was struck in the back of the head with the arm of a wheelchair and fell to the ground as a result of a head wound that was bleeding profusely.  (SUF 4.)

The building alarms sounded, and an emergency was announced that staff had been assaulted in Unit C2B.  (SUF 6.)  In response, custody and medical staff responded to Unit C2B and Cell No. 114.  (SUF 7.)  Some staff attended to plaintiff, who was lying on his bed, and other staff attended to Mageria, who was bleeding from the head.  (SUF 8.)  Some of the custody staff

who attended to plaintiff used force.  (SUF 9.)  After the alarms went off around 1:53 p.m., Plaintiff's hands were handcuffed in the front with metal handcuffs.  (SUF 10.)  Plaintiff is paralyzed from the waist down but can move his arms.  (SUF 11.)

Plaintiff maintained Correctional Officer ("C/O") Merrifield struck Nurse Mageria with the arm of the wheelchair, which led to other staff falsely believing plaintiff was the one who assaulted the nurse and prompted the ensuing excessive force.  (SUF 5.)  Plaintiff had access to the incident report for the assault on Nurse Mageria and, except for defendants Williams and Branion, used it to name the defendants who assaulted him.  (SUFs 12-14, 35, 46.)

Nurse Mageria suffered a deep laceration in the back of his head.  (SUF 72.)  He was provided emergency care by CDCR staff until outside medical personnel took him to an outside hospital.  (SUFs 76, 77.)  Mageria medically retired from CDCR on December 23, 2023, due to the injuries he suffered on September 14, 2020.  (SUF 78.)

### B. Facts Regarding Custodial Defendants

#### i. Defendant Williams

Plaintiff remembers Williams as one of the first staff to respond after the assault on Mageria.  Plaintiff claims Williams tightened the restraints as tight as possible and then tried to twist and bend Plaintiff's wrist and fingers.  (SUF 15.)  Plaintiff cannot recall what defendant Williams looked like.  (SUF 16.)  Defendant Williams was a C/O who was assigned to Unit C2B and was responsible to let people in and out of the unit.  (SUF 17.)  Plaintiff stated the hand restraints did not cause any serious injury during the incident.  (SUF 18.)

#### ii. Defendant Sarai

Plaintiff states that defendant Sarai did not assault him.  (SUF 19.)  Plaintiff also believed Sarai should have pressed an alarm button when he saw plaintiff was being assaulted by the other C/Os.  (SUF 73.)  Sarai was a C/O at CHCF and going to his post when the alarm sounded. When Sarai entered Cell No. 114, he tried to order plaintiff to turn away from staff who were helping treat Mageria.  Sarai put his hand on plaintiff's shoulder to try to turn him away, when plaintiff started thrashing his body around and swinging his arms and hands.  Sarai kept a grip on plaintiff's shoulder and upper body area until plaintiff stopped his movements.  (SUF 74.)

### iii. Defendant Branion

Defendant Branion, a C/O, responded to the emergency in Unit C2B.  After he helped lift Nurse Mageria onto a gurney and move it out of Cell No. 114, he ran back inside Cell No. 114 because he heard staff yell "stop resisting" and saw that plaintiff was thrashing his body from side to side and moving his hands and arms towards staff.  Branion tried to grab onto plaintiff's left shoulder area, but plaintiff tried to strike him with his fists and metal handcuffs.  Branion punched plaintiff in the upper body area to regain control of the situation.  (SUF 20.)

Defendant Branion punched plaintiff approximately eight times in the upper body area because he was fearful plaintiff might strike him or other staff around him with his fists and handcuffs.  Defendant Branion took a moment after each punch to assess whether or he needed to throw another punch to stop Plaintiff's thrashing and swinging, as he believed Plaintiff's ongoing actions posed an immediate threat to him and other staff.  Defendant Branion stopped punching when Plaintiff stopped his thrashing and swinging of his hands.  (SUF 21.)

### iv. Defendant Belluomini

Plaintiff does not specifically recall anything that Defendant Belluomini did to him during the incident.  (SUF 22.)  Belluomini was a C/O who responded to the incident. After he arrived, he applied pressure on Nurse Mageria's head wound with his hand until medical staff arrived. (SUF 23.)  Belluomini did not use any force on plaintiff on September 14, 2020.  (SUF 24.)

### v. Defendant Strope

Defendant Strope was a C/O when he responded to Cell No. 114 in Unit C2B.  He heard plaintiff yelling, "fuck you bitches," and tried to calm plaintiff down.  (SUF 25.)  Strope held onto plaintiff's handcuffs with his left hand and tried to search Plaintiff with his right hand, but plaintiff grabbed Strope's left hand and entangled the handcuff chain around his hand and twisted it, causing Strope great pain.  Defendant Strope yelled at plaintiff to let go, and he punched plaintiff in the face because plaintiff continued to hold onto his left hand and twist it.  Defendant Strope punched plaintiff a second time in the face and told him again to let go of his hand.  Defendant Strope punched plaintiff a third time after he yelled at him to stop and let go of his hand.  After the third punch, plaintiff let go of Defendant Strope's hand.  (SUF 26.)

6

1       Defendant Strope left Cell No. 114 afterwards to get gloves and returned to see if his help

2   was needed.  (SUF 27.)  Defendant Strope was asked to help lift plaintiff from the bed to the

3   floor, so they could better search the bed and plaintiff for weapons and contraband.  Defendant

4   Strope was lifting plaintiff's upper body off the bed when plaintiff grabbed onto the side of the

5   bed, causing defendant Strope to lose his balance, which prompted both he and plaintiff to fall

6   onto the ground.  Plaintiff fell onto Strope's hand, causing great pain.  (SUF 28.)  Defendant

7   Strope went to the hospital to check out his left hand, and the diagnosis was a fracture and a soft-

8   tissue injury that would require physical therapy and surgical intervention.  (SUF 29.)

9                         **vi.  Defendant Bargstadt**

10      Plaintiff does not specifically recall anything that Defendant Bargstadt did to him on

11  September 14, 2020.  (SUF 30.)  Bargstadt was a sergeant at CHCF and responded to the incident

12  in Unit C2B in Cell No. 114.  Plaintiff was yelling obscenities when Bargstadt arrived and went

13  over to plaintiff's bed to calm him down.  Bargstadt punched plaintiff once in the face when

14  plaintiff suddenly sat up and lunged at him with his clenched fists.  Defendant Bargstadt stated

15  that he then tried to hold plaintiff down as plaintiff continued to thrash and swing his arms at him

16  and other staff.  Defendant Bargstadt let go of plaintiff once plaintiff stopped moving.  (SUF 31.)

17                        **vii.  Defendant Bunch**

18      Plaintiff does not remember what Defendant Bunch looks like and generally remembers

19  Bunch punching him during the incident.  (SUF 32.)  Bunch stated that he did not use any force

20  on plaintiff.  (SUF 33.)  Bunch was the Facility C Sergeant, and he provided oversight over the

21  incident, such as ensuring staff completed their reports, and reviewing such reports.  (SUF 34.)

22                        **viii.  Defendant Castille**

23      Defendant Castille was the Facility C Lieutenant.  By the time he arrived, staff were

24  already handling plaintiff and Mageria.  Castille decided to assist with incident management.

25  (SUF 36.)  Castille did not use any force on plaintiff on September 14, 2020.  (SUF 37.)

26                        **ix.  Defendant Dennis**

27      Defendant Dennis was a C/O assigned to Unit C5A when he responded to the alarm in

28  Unit C2B.  When he arrived, several staff handling Mageria and plaintiff.  Dennis helped move

1    inmates who were staring into Unit C2B.  (SUF 38.)  He did not use force on plaintiff.  (SUF 39.)

2    ### x.  Defendant McElroy

3    Defendant McElroy was a sergeant at CHCF on September 14, 2020, and ordered plaintiff

4    to stop resisting when he saw Plaintiff thrashing his body from side to side, then went to open the

5    back door to Unit C2B for medical staff to bring a gurney for Nurse Mageria, and then waited to

6    let medical staff take Nurse Mageria out the back door before securing it and leaving Unit C2B.

7    (SUF 40.)  On September 14, 2020, Defendant McElroy did not use force on plaintiff.  (SUF 41.)

8    ### xi.  Defendant Priest

9    Defendant Priest was a C/O at CHCF.  When he went to Unit C2B, Cell No. 114, he

10    helped staff lift Mageria onto a gurney and later rendered assistance to another C/O who was

11    having difficulty.  (SUF 42.)  Priest did not use force on plaintiff during the incident.  (SUF 43.)

12    ### xii.  Defendant Purtle

13    Defendant Purtle was the Central Kitchen Sergeant at CHCF.  After Purtle responded to

14    the alarm in Unit C2B, he placed towels around the blood pooling on the floor of Cell No. 114,

15    checked plaintiff's person for contraband without incident, and then returned to his post.  (SUF

16    44.)  Purtle conducted a clothed body search of plaintiff but did not use any force.  (SUF 45.)

17    ### C.  Resulting Punishment from Incident

18    On September 15, 2020, Plaintiff was written up for attempted murder of Nurse Mageria,

19    Log No. 7029805.  Plaintiff received a copy of the Rules Violation Report ("RVR") for Log No.

20    7029805.  (SUF 51.)  On April 21, 2021, after a hearing on the RVR, Plaintiff was found guilty of

21    the Attempted Murder of Nurse Mageria and lost 360 days of credit.  (SUF 52.)

22    On January 14, 2021, plaintiff was charged with two counts of battery by a prisoner in

23    violation of Cal. Penal Code § 4501.5, for his actions against Mageria and Strope.  (ECF No. 47.)

24    On March 10, 2021, Plaintiff pled no-contest to attacking Mageria and admitted he did so without

25    provocation, which caused a laceration to Mageria's head.  (ECF No. 48.)  He also pled no

26    contest to causing injuries to Strope's hand during the struggle that ensued after Mageria was

27    attacked.  (ECF No. 49.)  On March 10, 2021, Plaintiff was sentenced to six years of

28    imprisonment.  (ECF No. 50.)  Plaintiff's six-year term has not been overturned, and the 360 days

of lost credit for the attempted murder of Nurse Mageria has not been restored.  (SUF 53.)

### D. Facts Regarding Medical Defendants

Plaintiff's failure-to-intervene claims arise from his review of the incident report following the assault on Nurse Mageria.  (SUF 54, 55.)  While plaintiff claimed to have yelled the names of defendants Arciga, Abraham, Thomas, Reyes, and Farhat during the incident, he admits he only knew Defendant Farhat's name.  (SUF 56.)

#### i.  Defendant Arciga

Plaintiff does not specifically recall defendant Arciga, a Registered Nurse at CHCF, and only sued Arciga based on the incident report.  (SUF 57.)  Arciga's shift began at 2 p.m.  At approximately 2:20 p.m., Arciga conducted a physical examination of plaintiff and noted: 1) swelling and abrasion/scratch on the right side of his face; 2) bruising and swelling on the front, left side of his head; 3) bruising on the back of his left wrist, and 4) abrasions on the back of his right, upper arm.  Arciga also noted a pre-existing ulcer on one of plaintiff's buttocks.  (SUF 59.)

Plaintiff believes Defendant Arciga should have pressed an alarm, notified the watch commander, Warden, or somebody in authority about plaintiff being assaulted by correctional officers, or told the correctional officers to stop assaulting plaintiff.  (SUF 62.)  Plaintiff's understanding of the prison alarm system is that a new alarm would have caused other correctional officers to come check on plaintiff.  (SUF 63.)

#### ii.  Defendant Farhat

Plaintiff states he yelled out to Defendant Farhat for help while he was being assaulted.  (SUF 64.)  Farhat, a Physician and Surgeon at CHCF, monitored medical staff from outside Cell No. 114, as they were attending to Nurse Mageria, in case they needed his help.  (SUF 65.)

#### iii.  Defendant Reyes

Plaintiff does not specifically recall Defendant Reyes.  (SUF 66.)  Reyes, a nurse at CHCF, helped apply pressure to Mageria's head wound on September 14, 2020.  (SUF 67.)

#### iv.  Defendant Thomas

Plaintiff does not specifically recall Defendant Thomas.  (SUF 68.)  Thomas, a nurse at CHCF, provided emergency treatment to Nurse Mageria and lifted him onto a gurney.  (SUF 69.)

1          **v. Defendant Abraham**

2          Plaintiff does not specifically recall Defendant Abraham.  (SUF 70.)  Abraham, a nurse at

3    CHCF, completed an injury assessment of Nurse Mageria on September 14, 2020.  (SUF 71.)

4          **E. Grievances**

5          On September 28, 2020, Plaintiff filed a grievance complaining about staff using

6    excessive force on him on September 14, 2020 (log #44784).  He alleged: 1) that it was Officer

7    Merrifield who attacked Nurse Mageria and lied that it was Plaintiff who attacked him; 2) that

8    Plaintiff's medical assessment was altered; 3) that he claimed he was suicidal so he wouldn't be

9    left alone and attacked by staff.  Plaintiff requested, *inter alia*, an investigation, termination of

10   officers involved, an examination at a local hospital, dropping of the charges, and staff training.

11   (SUF 79.)  On November 25, 2020, the CHCF Grievance Office responded that "[s]taff did not

12   violate CDCR policy with respect to the issues raised within the grievance."  (SUF 80.)

13         Plaintiff appealed to the Office of Appeals (OOA) on December 30, 2020.  OOA

14   responded on March 1, 2021.  OOA determined that plaintiff's allegations were not addressed and

15   ordered another grievance log number to be assigned (#115024) and the institution to follow-up

16   with a new response.  OOA also stated "[t]his decision exhausts the administrative remedies

17   available to the claimant within CDCR."  (SUF 81.)  On June 23, 2021, the CHCF Grievance

18   Office responded to Plaintiff, Log #115024, and concluded that "[s]taff did not violate CDCR

19   policy with respect to the issues raised within the grievance."  This response also stated, "[i]f you

20   are dissatisfied with the decision of this claim, you may file a 602-2, appeal with the California

21   Department of Corrections and Rehabilitation Office of Appeals."  (SUF 82.)

22         Plaintiff's grievance and his appeal for log #44784 do not complain about staff failing to

23   intervene during the use of force on Plaintiff on September 14, 2020.  (SUF 83.)  After Plaintiff

24   received the response for Log #115024, which disapproved Plaintiff's complaint of staff

25   misconduct on September 14, 2020, Plaintiff did not appeal that decision.  (SUF 84.)

26                    **LEGAL STANDARD ON SUMMARY JUDGMENT**

27         Summary judgment is appropriate when it is demonstrated that there "is no genuine

28   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact."  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.  In such a circumstance, summary judgment should "be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(c).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is

genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Adv. Comm. Note to 1963 Amendments to Fed. R. Civ. P. 56(e)).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

## DISCUSSION

### I.    Whether the Claim Against Defendant Strope is Heck-barred

Defendant Strope argues plaintiff's excessive force claim is barred by Heck. Strope maintains that success on plaintiff's claim would invalidate his underlying conviction for attacking Nurse Mageria and defendant Strope, both of which are tied together via the factual basis described at plaintiff's sentencing.[2] (ECF No. 57-1 at 16-17.)

---

[2]  Heck also applies to prison disciplinary proceedings that result in the loss of good-time credits. See Edwards v. Balisok, 520 U.S. 641, 648 (1997). While plaintiff's RVR hearing resulted in the loss of 360 days of good-time credits, the RVR was based on the attempted murder of Mageria and did not include Strope. (See Campos Decl., Exh. 3, ECF No. 57-15 at 75-79.)

1        In <u>Heck</u>, the Supreme Court held that a § 1983 claim that necessarily implies the

2  invalidity of a conviction cannot be maintained unless the conviction has been overturned.  512

3  U.S. at 486–87.  Thus, "a state prisoner's § 1983 action is barred (absent prior invalidation)—no

4  matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit

5  (state conduct leading to conviction or internal prison proceedings)—*if* success in that action

6  would necessarily demonstrate the invalidity of confinement or its duration."  <u>Wilkinson v.</u>

7  <u>Dotson</u>, 544 U.S. 74, 81-82 (2005) (emphasis in original).

8        <u>Heck</u> analysis is required "even where the plaintiff's prior convictions were the result of

9  guilty or no contest pleas."  <u>See</u> <u>Radwan v. Cnty. of Orange</u>, 519 F. App'x 490, 490-91 (9th Cir.

10  2013) (citations omitted).  "To decide whether success on a section 1983 claim would necessarily

11  imply the invalidity of a conviction, we must determine which acts formed the basis for the

12  conviction.  When the conviction is based on a guilty plea, we look at the record to see which acts

13  formed the basis for the plea."  <u>Lemos v. Cnty. of Sonoma</u>, 40 F.4th 1002, 1006 (9th Cir. 2022)

14  (en banc) (citations omitted); <u>see</u> also <u>Sanders v. City of Pittsburg</u>, 14 F.4th 968, 972 (9th Cir.

15  2021) (looking to factual basis of no contest plea in finding § 1983 action barred by <u>Heck</u>).  It is

16  ultimately the defendant's burden to establish the factual basis for the conviction.  <u>Sanford v.</u>

17  <u>Motts</u>, 258 F.3d 1117, 1119 (9th Cir. 2001).

18        Plaintiff pleaded no contest to two counts of battery by a prisoner in violation of

19  California Penal Code § 4501.5 and received a six-year sentence.  (Declaration of A. Gottlieb

20  ("Gottlieb Decl."), Exh. 3, ECF No. 57-18 at 15.)  Section 4501.5 provides that "[e]very person

21  confined in a state prison of this state who commits a battery upon the person of any individual

22  who is not himself a person confined therein shall be guilty of a felony[.]"  The stipulated factual

23  basis for plaintiff's conviction was as follows:

24          On September 14, 2020, the defendant was an inmate with [CDCR] . . . . On that
           particular date he was being treated by registered nurse Mageria . . . . While he

25          was being treated, he was unprovoked and attacked the nurse, causing a laceration
           to the head. Officers responded. During the struggle that ensued, Officer Strope . .

26          . suffered injuries to his hand and a laceration.

27  (Gottlieb Decl., Exh. 3, ECF No. 57-18 at 19-20.)

28        <u>Heck</u> does not bar a § 1983 claim for excessive force where "the conviction and the §

1   1983 claim are based on different actions during one continuous transaction."  Hooper v. County

2   of San Diego, 629 F.3d 1127, 1134 (9th Cir. 2011) (quotation omitted).  Here, the stipulated facts

3   do not provide specific details on the altercation.  As a result, the undersigned cannot say as a

4   matter of law that plaintiff's § 1983 claim and battery conviction are based on the same actions.

5   See Martell v. Cole, 115 F.4th 1233, 1237 (9th Cir. 2024) (no Heck bar where factual predicate

6   did not specify actions that formed the basis of plea).

7        For example, plaintiff's complaint alleges defendant Strope beat plaintiff and pushed him

8   to the floor after someone yelled "let's stop now."  (ECF No. 1 at 6.)  It is possible that the

9   disputed push to the floor happened *after* the "struggle" in the factual basis for plaintiff's criminal

10  plea.[3]  If plaintiff were to establish that discontinuity, success on his § 1983 action would not

11  necessarily invalidate his conviction for battering Strope or Mageria.  See Smith v. City of

12  Hemet, 394 F.3d 689, 693 (9th Cir. 2005) (en banc) (excessive force claim is not barred by Heck

13  where use of force takes place "subsequent to the time [plaintiff] engaged in the conduct that

14  constituted the basis for his conviction").  Because the factual basis lacks the details needed to

15  resolve that question, Strope is not entitled to summary judgment on Heck grounds.

16       Heck also does not bar plaintiff's claim because § 4501.5 does not include an element that

17  the victim of the battery was acting lawfully.  "In evaluating whether claims are barred by Heck,

18  an important touchstone is whether a § 1983 plaintiff could prevail only by negating 'an element

19  of the offense of which he has been convicted.'"  Cunningham v. Gates, 312 F.3d 1148, 1153–54

20  (9th Cir. 2002) (quoting Heck, 512 U.S. at 487 n.6), as amended on denial of reh'g (Jan. 14,

21  2003).  Unlike the obstruction conviction at issue in Hooper, in which "[t]he lawfulness of the

22  officer's conduct is an essential element of the offense," 629 F.3d at 1130, a § 4501.5 conviction

23  requires no similar proof of the victim's lawful conduct.  See Jacobs v. Davey, No. 1:11-cv-0934

24  AWI SKO HC, 2014 WL 6962909, at *7 (E.D. Cal. Dec. 9, 2014) ("The elements of a violation

25  of [§ 4501.5] are: (1) The defendant was confined in a state prison; (2) while confined, the

26

27  [3]  Strope's declaration does not foreclose this possibility.  Strope states that he left the cell after
    the initial altercation with plaintiff to get gloves.  Plaintiff then inadvertently fell to the floor after
28  Strope returned.  (Declaration of J. Strope ("Strope Decl.") ¶ 6, ECF No. 57-10 at 3.)

14

1    defendant willfully touched the victim in a harmful or offensive manner; and (3) the victim was

2    not confined in a state prison. (CALCRIM No. 2723.)") (quoting People v. Flores, 176

3    Cal.App.4th 924, 930 (Cal. Ct. App. 2009)).  Indeed, judges of this District have generally found

4    that success on a § 1983 excessive force claim would not inherently negate an element of §

5    4501.5.  See Hilson v. Arnett, No. 1:15-CV-1240 DAD MJS PC, 2017 WL 1375219, at *5 (E.D.

6    Cal. Apr. 17, 2017), report and recommendation adopted, No. 1:15-CV-1240 DAD MJS PC, 2017

7    WL 1956729 (E.D. Cal. May 11, 2017); Bouie v. Smith, No. 2:18-CV-2040 KJM AC P, 2024

8    WL 3088474, at *13 (E.D. Cal. June 18, 2024), report and recommendation adopted, No. 2:18-

9    CV-2040 DC AC (PC), 2024 WL 4973506 (E.D. Cal. Dec. 4, 2024).[4]  Proof that Strope used

10   excessive force against plaintiff would not negate an element of plaintiff's § 4501.5 conviction.[5]

11   That is an additional reason for finding that Heck does not bar plaintiff's excessive force claim

12   against Strope.

13   ////

14   ////

15

16   [4]  As Magistrate Judge Claire noted in Bouie, "Unlike other forms of battery that require the
     officer be engaged in the performance of their duties and therefore acting lawfully, see, e.g., Cal.

17   Penal Code. § 243(b)-(c) (battery against peace officer or custodial officer in performance of their
     duties); Cal. Penal Code § 243.1 (battery against custodial officer in performance of duties); see

18   also People v. Cruz, 44 Cal. 4th 636, 673, 80 Cal.Rptr.3d 126, 187 P.3d 970 (2008) (where statute
     makes it a crime to commit act against peace officer engaged in performance of their duties,

19   officer was necessarily acting lawfully at the time (citation omitted)), § 4501.5 contains no such

20   requirement[.]"  2024 WL 3088474, at 13 n.5.
     [5]  Some judges have determined that unlawfulness of the victim's force is effectively an element

21   of § 4501.5 by finding that the state must prove the absence of lawful self-defense on the part of
     the criminal defendant (the plaintiff in the subsequent civil rights action).  See Monaco v.

22   Moberg, No. CV 07-6536 CAS (FMO), 2008 WL 11411716, at *4 (C.D. Cal. Jan. 7, 2008) ("If
     plaintiff were to succeed in challenging the level of force used during the battery incident, the

23   validity of the [§ 4501.5] conviction would be called into question because such a finding would
     mean that [defendant's] use of force was unlawful and plaintiff would have been justified in using

24   reasonable force to defend himself[.]"), report and recommendation adopted, No. CV 07-6536
     CAS (FMO), 2008 WL 11411735 (C.D. Cal. Jan. 30, 2008), aff'd in part as modified, vacated in

25   part, 362 F. App'x 866 (9th Cir. 2010).  However, it is far from clear that absence of self-defense

26   is a necessary element of § 4501.5.  See Tramel v. Ramos, No. 2:23-cv-1111 KJM AC, 2025 WL

27   2355796, at *4 (E.D. Cal. Aug. 14, 2025) (noting that the CALCRIM instruction on § 4501.5
     "requires an instruction regarding self-defense only if the issue of self-defense is raised by the

28   evidence").

1    **II.    Eighth Amendment Excessive Force**

2        **A.  Legal Standard**

3        The Eighth Amendment prohibits prison officials from inflicting cruel and unusual

4    punishment on inmates which, in excessive force cases, has been defined as "the unnecessary and

5    wanton infliction of pain."  Whitley v. Albers, 475 U.S. 312, 319 (1986).  "[W]henever prison

6    officials stand accused of using excessive physical force … the core judicial inquiry is … whether

7    force was applied in a good-faith effort to maintain or restore discipline, or maliciously and

8    sadistically to cause harm."  Hudson v. McMillan, 503 U.S. 1, 7 (1992).

9        The malicious and sadistic use of force to cause harm always violates contemporary

10   standards of decency, regardless of whether significant injury is evident.  Id. at 9.  However, not

11   "every malevolent touch by a prison guard gives rise to a federal cause of action."  Hudson, 503

12   U.S. at 9.  "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily

13   excludes from constitutional recognition de minimis uses of physical force, provided that the use

14   of force is not of a sort 'repugnant to the conscience of mankind.'"  Id. at 9-10 (internal

15   quotations marks and citations omitted).

16       The Ninth Circuit applies a five-factor test to determine whether the force was excessive:

17   (1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the

18   relationship between that need and the amount of force used; (4) the threat reasonably perceived

19   by the responsible officials; and (5) any efforts made to temper the severity of the forceful

20   response.  Hughes v. Rodriguez, 31 F.4th 1211, 1221 (9th Cir. 2022) (citing Furnace v. Sullivan,

21   705 F.3d 1021, 1028 (9th Cir. 2013)).  In weighing the last four factors, courts must be mindful

22   that "in making and carrying out decisions involving the use of force to restore order in the face

23   of a prison disturbance, prison officials undoubtedly must take into account the very real threats

24   the unrest presents to inmates and prison officials alike, in addition to the possible harms to

25   inmates against whom force might be used."  Whitely, 475 U.S. at 320.  However, the absence of

26   an emergency may be probative of whether the force was indeed inflicted maliciously or

27   sadistically.  Jordan v. Gardner, 986 F.2d 1521, 1528 (9th Cir. 1993) (en banc).

28   /////

1        **B. Analysis**

2            **i. Defendants Asserting No Use of Force**

3        Defendants Purtle (ECF No. 57-11), Priest (57-12), Belluomini (57-13), Castille (57-14),

4    Bunch (57-16), Dennis (57-21), and McElroy (57-22) state in sworn declarations that they did not

5    use force on plaintiff.  Moreover, the incident report does not describe any use of force by these

6    defendants.  It cites only defendants Bargstadt, Branion, Sarai, and Strope, as well as

7    nondefendant Merrifield, as using force.[6]  (Campos Decl., Exh. 1, ECF No. 57-15 at 45.)

8        The burden shifts to plaintiff to establish genuine disputes.  Plaintiff alleged in his

9    complaint that each of these defendants "punched him in the head, face, ear and torso."  (ECF No.

10   1 at 5-11, 21.)  These allegations, which are identical for each defendant and track the elements of

11   an excessive force claim, are too conclusory to establish triable issues.  "[Rule 56] requires that

12   the party opposing a motion for summary judgment set out *specific* facts—that is, the court will

13   not presume that general allegations embrace more specific facts to support the claim."  Sullivan

14   v. Dollar Tree Stores, Inc., 623 F.3d 770, 779 (9th Cir. 2010) (disregarding "unsupported" and

15   "unexplained" assertions in plaintiff's opposing affidavit; see also F.T.C. v. Stefanchik, 559 F.3d

16   924, 929 (9th Cir. 2009) ("A non-movant's bald assertions or a mere scintilla of evidence in his

17   favor are both insufficient to withstand summary judgment.") (citation omitted).

18       It also appears that the allegations are not based on plaintiff's personal knowledge.

19   Plaintiff testified that he did not recall anything these defendants did but believes they punched

20   him based on their inclusion in the incident report: "For sure Branion [hit me] . . . the rest of the

21   officers that attacked me, I know that they the ones that attacked me because it shows – it says in

22   their incident report that they attacked me."  (Declaration of Dennis M. Wong ("Wong Decl."),

23   Exh. 1, ECF No. 57-3 at 35-36.)

24       Under these circumstances, the conclusory allegations in plaintiff's verified complaint do

25   ────────────────────

26   [6]  Plaintiff did not allege excessive force against defendant Sarai.  See ECF No. 1 at 13 ("I
     thanked [Sarai] for not assaulting me").  In the incident report, Sarai recounts using a "minimal

27   amount of necessary force": "[I] placed my right hand on [plaintiff's] shoulder and applied
     downward pressure and gave a direct order to 'stop resisting' in which he complied."

28   (Declaration of E. Campos ("Campos Decl."), Exh. 1, ECF No. 57-15 at 57.)

1  not create genuine issues of material fact.  See Moran v. Selig, 447 F.3d 748, 760 n.16 (9th Cir.

2  2006) ("[A] verified complaint may serve as an affidavit for purposes of summary judgment if it

3  is based on personal knowledge and if it sets forth the requisite facts *with specificity*.") (emphasis

4  added).  As plaintiff has not put forth any other evidence to rebut defendants' declarations, the

5  undersigned recommends that summary judgment be granted to Purtle, Priest, Belluomini,

6  Castille, Bunch, Dennis, and McElroy on plaintiff's Eighth Amendment excessive force claim.

7  ## ii.  Whether Defendant Williams Used Excessive Force

8  Like the defendants above, defendant Williams asserts he used no force.  Per the incident

9  report, Williams merely let staff in and out of the unit during the incident.  (Campos Decl., Exh.

10  1, ECF No. 57-3 at 39, 49, 70.)  The burden then shifts to plaintiff.  Unlike with the other

11  defendants who denied using force, plaintiff's verified complaint offers more than conclusory

12  allegations about Williams.  Plaintiff claims defendant Williams tightened his restraints and

13  "began to twist and bend" his wrist and fingers with intent to "break or damage them."[7]  (ECF

14  No. 1 at 5.)  Plaintiff suffered "black track marks on his wrist" and two sprained fingers.  (Id.)

15  Nevertheless, Williams maintains plaintiff's allegations, accepted as true, do not establish

16  excessive force.  (ECF No. 57-1 at 21-22.)  The undersigned agrees.  First, regarding the extent of

17  his injury, plaintiff testified at his deposition that the marks on his wrist were not serious.  When

18  asked whether the hand restraints broke skin, plaintiff responded, "Probably . . . little scratches.

19  Nothing serious."  (Wong. Decl., Exh. 1, ECF No. 57-3 at 108-09).  Regarding his fingers,

20  plaintiff complained he didn't receive a splint but admitted they were not broken and healed on

21  their own.  (Id. at 105.)

22  Turning to the proportionality factors, it is notable that plaintiff testified in his deposition

23  that Williams was one of the first C/Os to respond.  (Pltf. Dep., ECF No. 56 at 36.)  Plaintiff

24  similarly alleged in his complaint that nondefendant Merrifield informed responding officers,

25  including Williams, that plaintiff struck Mageria.  (ECF No. 1 at 5.)  Thus, even under plaintiff's

26  version of events, it is reasonable to infer that Williams believed he was responding to an

27

28  [7]  Plaintiff said at his deposition that he was already cuffed when the C/Os responded because CDCR policy requires inmates be restrained during wound care.  (Pltf. Dep., ECF No. 56 at 31.)

immediate threat to staff safety.  See Wallace v. Moberg, No. CV 07-6-VAP (AGR), 2009 WL 91079, at *7 (C.D. Cal. Jan. 10, 2009) (granting summary to prison officials where plaintiff's facts established defendants reasonably perceived a safety threat before using pepper spray). Williams' perception of a risk would also distinguish this case from others where courts found genuine disputes as to whether wrist twisting and tight restraints constituted excessive force.  See, e.g., Dao v. Tabor, No. 2:22-CV-0846 TLN CSK P, 2024 WL 2259138, at *9 (E.D. Cal. May 17, 2024) (denying summary judgment to prison officials where plaintiff asserted he was on the ground and not resisting when use force was applied), report and recommendation adopted, No. 2:22-CV-0846 TLN CSK, 2024 WL 4268095 (E.D. Cal. Sept. 23, 2024).

Williams's alleged use of force is by no means trivial.  But the crux of the complaint's claim against Williams is that plaintiff did not strike Mageria and was "absolutely no threat to any one officer" when Williams responded and tightened his handcuffs.  (ECF No. 1 at 5.)  Plaintiff cannot deny the facts underlying his battery conviction—that "he was unprovoked and attacked the nurse, causing a laceration to the head"[8]—to dispute Williams' perception of a threat.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007).  In sum, plaintiff's excessive force claim should not go to trial where plaintiff asserts de minimis injuries and Williams, in a version of events to which plaintiff stipulated, reasonably perceived an immediate risk to staff safety when he responded to an alarm and applied force. Accordingly, summary judgment should be granted to Williams.

### iii.  Whether Defendant Bargstadt Used Excessive Force

Defendant Bragstadt admits to punching plaintiff once in the face when plaintiff lunged at him with closed fists.  (Declaration of J. Bargstadt ("Bargstadt Decl.") ¶ 2, ECF No. 57-4 at 1-2.) Plaintiff stated at his deposition that he does not recall anything Bargstadt did during the incident (Wong Decl., Exh. 1, ECF No. 57-3 at 37-38) and the complaint allegations against Bargstadt

---

[8]  This is verbatim from the factual basis to which plaintiff stipulated in the course of pleading no contest to battering Mageria.  (Gottlieb Decl., Exh. 3, ECF No. 57-18 at 19-20.)

1  recite only the basic elements of an excessive force claim.  (See ECF No. 1 at 9, 11-12.)

2  Therefore, as with the defendants asserting no use of force, plaintiff has not genuinely disputed

3  Bargstadt's version of events.

4          Applying the factors, the nature and severity of plaintiff's injuries may favor plaintiff.

5  Here, the post-incident injury report showed facial bruising, abrasions, and swelling.

6  (Declaration of S. Arciga ¶ 2, ECF No. 57-6 at 1-2.)  Plaintiff similarly alleged a black eye and

7  facial swelling in his complaint.[9]  (See ECF No. 1 at 5.)  The undersigned recognizes that district

8  courts have commonly found similar injuries to not be sufficiently serious for purposes of Eighth

9  Amendment excessive force liability.  See Ward v. Oromde, No. CIV S-09-2542 CMK P, 2011

10  WL 4056035, at *5 (E.D. Cal. Sept. 12, 2011) (collecting cases), aff'd, 519 F. App'x 470 (9th

11  Cir. 2013) ("[C]omplaints of bruising, swelling, scrapes, and pain, without evidence of more

12  serious injury, indicate de minimus injury at best.").  However, in the absence of higher authority

13  finding facial bruising, abrasions, and swelling to be only de minimis, those injuries could be

14  sufficiently serious for the "extent of the injury" factor to favor plaintiff.  See Hudson, 503 U.S. at

15  9-10 (stating that only "de minimis" force categorically falls outside the province of Eighth

16  Amendment inquiry, so long as it is not otherwise "repugnant").  However, as explained below,

17  the weight of the analysis demonstrates that Bargstadt should be granted summary judgment.

18          Bargstadt's declaration and the incident report give a full picture of his use of force.

19  Bargstadt was responding to a radio call of a staff assault in plaintiff's cell and saw Mageria

20  bloodied on the ground when he arrived.  (Bargstadt Decl. ¶ 2, ECF No. 57-4.)  Plaintiff was

21  handcuffed and compliant while Bargstadt, defendant Branion, and others loaded Mageria onto a

22  gurney.  (Id.; Campos Decl., Exh. 1, ECF No. 57-15 at 47 ("At this time it did not appear that

23  Inmate McDougland was resisting, nor did it appear that any force was being utilized").)

24  Bargstadt then heard plaintiff yelling obscenities and tried to calm him down.  Bargstadt punched

25  plaintiff once when plaintiff lunged at him.  (Bargstadt Decl. ¶ 2, ECF No. 57-4.)  Bargstadt was

26  aware plaintiff recently struck Mageria and was fearful for his safety.  (Id.)

27

28  [9]  However, at his deposition, plaintiff confirmed x-rays were negative and his hearing was
    unaffected.  (Wong Decl., Exh. 1, ECF No. 154-56.)

This chain of events supports the need for force and the reasonableness of Bargstadt's belief that plaintiff was a threat. Further, while plaintiff was in restraints at the time of the punch, Bargstadt's testimony shows that plaintiff was still resisting. By contrast, courts have found the striking of restrained individuals to be excessive where they are compliant and in control. See Hudson, 503 U.S. at 13 (Stevens, J., concurring) ("[B]ecause there was no prison disturbance and no need to use any force since the plaintiff was already in restraints . . . the prison guards' attack upon petitioner resulted in the infliction of unnecessary and wanton pain."); Madrid v. Gomez, 889 F. Supp. 1146, 1166 (N.D. Cal. 1995) (prison official's two punches were excessive where plaintiff was restrained, "under control," and "offering no resistance"). Finally, the fact Bargstadt punched plaintiff only once demonstrates some effort to temper the severity of his response.

Given the factors largely favor Bargstadt, no reasonable juror could conclude his single punch was for any purpose other than maintaining discipline. Accordingly, the undersigned recommends that summary judgment be granted to defendant Bargstadt.

### iv. Whether Defendant Strope Used Excessive Force

### 1. Factor Analysis

Defendant Strope was involved in two incidents. First, Strope attempted to search plaintiff after the attack on Mageria. He admits to punching plaintiff three times after plaintiff entangled his handcuffs around Strope's left hand, causing him "great pain." (Strope Decl. ¶ 3, ECF No. 57-10 at 2.) Defendant Strope's hand fracture required physical therapy and surgical intervention. (Id. ¶ 7.) Strope then left the cell to retrieve gloves. The second incident occurred when he returned. Strope states that plaintiff inadvertently fell to the floor while Strope and others tried to move him from his bed so that officials could search it for weapons. (Id. ¶ 6.)

While Strope threw more punches than Bargstadt, the lack of serious facial injuries and the need for force based on plaintiff's act of entangling Strope's hand in his handcuffs – which resulted in Strope's broken hand – are sufficient to satisfy his burden.[10] Strope's declaration also explains in detail how the second incident where plaintiff fell to the floor was an accident.

---

[10] The handcuff entanglement is likely the "struggle" from the factual basis of plaintiff's battery plea. As discussed above, the undersigned cannot say for sure due to the plea's lack of detail.

1    The burden again shifts to plaintiff.  The most detailed allegations in plaintiff's complaint

2    concern defendant Strope.  Plaintiff alleges Strope beat him while he was already in restraints and

3    other C/Os held him down.  After someone yelled, "let's stop now," Strope pushed him to the

4    floor "with all of his force."  Plaintiff described it as "like pushing someone into a pool."  (ECF

5    No. 1 at 6, 11.)  Plaintiff claims that Strope knew that he cannot walk and that the push would

6    cause him "unnecessary injury."  (ECF No. 1 at 6.)  At his deposition, plaintiff explained in detail

7    that he thought Strope was lifting him into his wheelchair but instead "threw me on the ground."

8    (Pltf. Dep., ECF No. 56 at 58-59.)

9    Plaintiff's complaint and deposition testimony do not genuinely dispute Strope's version

10    of the first incident.  The complaint allegation that Strope beat him unprovoked is "blatantly

11    contradicted" by his conviction for battery.  See Scott, 550 U.S. at 380; Gasaway v. Northwestern

12    Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994) (mere allegations or unsubstantiated denials

13    do not, without more, generate a genuine issue of material fact).  However, drawing all inferences

14    in plaintiff's favor, it is plausible that the disputed push to the floor happened after the first

15    incident when any perceived threat had subsided.  Under this scenario, a reasonable trier of fact

16    could conclude that defendant Strope's alleged forceful pushing of plaintiff, whom he knew was

17    paralyzed from the waist down, to the floor was done with malicious or sadistic intent.

### 2.  Qualified Immunity

19    Having found a genuine issue as to whether Strope used excessive force during the

20    contested push, the undersigned will consider whether he is entitled to qualified immunity.  In

21    resolving qualified immunity at summary judgment, courts engage in a two-pronged inquiry.  The

22    first asks whether the facts, viewed in the light most favorable to the plaintiff, demonstrate the

23    officials violated a constitutional right.  The second asks whether that right was "clearly

24    established" at the time of the alleged constitutional violation.  Peck v. Montoya, 51 F.4th 877,

25    887 (9th Cir. 2022) (citing Tolan v. Cotton, 572 U.S. 650, 655-56 (9th Cir. 2014) (per curiam)).

26    Defendant Strope's qualified immunity arguments address his punches to plaintiff and do

27    not consider the disputed push to the floor.  (See ECF No. 57-1 at 27.)  Regarding the push, the

28    undersigned cannot accept defendant Strope's explanation of an accident without resolving

1    disputed facts.  Under either prong of the qualified immunity analysis, "courts may not resolve

2    genuine disputes of fact in favor of the party seeking summary judgment."  Tolan, 572 U.S. at

3    656 (citations omitted); see also Torres v. City of Madera, 648 F.3d 1119, 1123 (9th Cir. 2011)

4    ("Where the objective reasonableness of an officer's conduct turns on disputed issues of material

5    fact, it is a question of fact best resolved by a jury, [and] only in the absence of material disputes

6    is it a pure question of law.") (internal quotation marks and citations omitted).

7         Accordingly, the undersigned recommends that plaintiff's excessive force claim against

8    defendant Strope be permitted to go to trial.  However, if plaintiff eventually succeeds, it should

9    be noted that the "relatively modest nature of his alleged injuries will no doubt limit the damages

10   he may recover."  Wilkins, 559 U.S. at 40.

11                    **v.  Whether Defendant Branion Used Excessive Force**

12                              **1.  Factor Analysis**

13        Defendant Branion's involvement in the incident began similarly to defendant Bragstadt's.

14   Branion helped load Mageria onto a gurney and responded to plaintiff when heard a commotion.

15   Branion then punched plaintiff approximately eight times in the right rib and upper torso area

16   while plaintiff resisted officers and thrashed his arms and metal handcuffs.  (Declaration of K.

17   Branion, Exh. 1, ECF No. 57-9 at 5.)

18        The post-incident injury report does not list rib or torso injuries (Campos Decl., Ech. 1,

19   ECF No. 57-15 at 40), which suggests the blows caused de minimis injury.  However, the number

20   of punches, which is disproportionate to the amount of force used by other C/Os during the same

21   incident, raises questions as to the proportionality of his response.  But even assuming Branion

22   has met his initial burden, the undersigned finds that Branion is not entitled to summary judgment

23   due to disputed facts.

24        The analysis of plaintiff's burden again starts with his complaint.  As with defendant

25   Bargstadt, the complaint's allegations regarding defendant Branion are formulaic and insufficient

26   to oppose summary judgment.  Plaintiff did complain about a swollen torso (ECF No. 1 at 5),

27   which the undersigned again finds could be sufficiently serious for the "extent of the injury"

28   factor to favor plaintiff.  Turning to his deposition, plaintiff specifically remembered Branion

1 because of his size, which he described as roughly 300 lbs.  (Pltf. Dep., ECF No. 56 at 30-31.)

2 Branion also commented, "[Y]ou're going to remember me," when plaintiff tried to find

3 Branion's nameplate while being punched.  (Id. at 47-48.)  Plaintiff described Branion as

4 punching him "like I was a bag at a gym[.]"  (Id. at 84.)  Plaintiff did not deny resisting Branion,

5 but framed his resistance as a reasonable response: "You think I'm going to stop after . . . he's

6 punching me?"  (Id.)

7       Plaintiff does not genuinely dispute that Branion's use of force was unprovoked.  Again,

8 the repeated assertions in his complaint and deposition that he did not strike Mageria and was

9 beaten unprovoked are belied by his battery convictions.  Further, he testified at his deposition

10 that the incident report showed he was compliant when Branion began to use force (Pltf. Dep.,

11 ECF No. 56 at 105), but that report plainly states he was "thrashing his body side to side and

12 thrusting his hands up attempting to strike the officers" when Branion intervened.  (ECF No. 57-

13 15 at 47.)

14       Still, it is undisputed Branion landed eight punches to plaintiff, and plaintiff's deposition

15 testimony supports the reasonable inference of a significant size and strength difference between

16 the two.  Therefore, even if Branion was justified in using some force in response to plaintiff's

17 thrashing and admitted resistance to Branion's punches, the undersigned cannot say as a matter of

18 law that punching plaintiff eight times was not excessive.  See Hoptowit v. Ray, 682 F.2d 1237,

19 1251 (9th Cir. 1982) ("[G]uards may use force only in proportion to the need in each situation.").

20 This question should be left to the trier of fact.

21                **2.  Qualified Immunity**

22       Like defendant Strope, defendant Branion is not entitled to qualified immunity.  Branion

23 argues that it was not clearly established that it was a constitutional violation to punch a prisoner

24 who had just assaulted a nurse and C/O, and then subsequently thrashed his body and swung his

25 hands that had on metal handcuffs.  (ECF No. 27-28.)  To be sure, Branion is owed considerable

26 deference when exercising judgment to maintain prison safety.  "[T]he use of force can be a

27 'legitimate means for preventing small disturbances from becoming dangerous to other inmates or

28 the prison personnel.'"  Simmons v. G. Arnett, 47 F.4th 927, 933 (9th Cir. 2022) (citing omitted).

1    However, it is well established that "[t]hat authorization ends . . . when the force used in the

2    action is so excessive as to violate a prisoner's constitutional rights." McRorie v. Shimoda, 795

3    F.2d 780, 784 (9th Cir. 1986) (citing Whitley, 475 U.S. at 322). Here, the undersigned cannot say

4    as a matter of law that Branion did not cross that line during the altercation with plaintiff.

5         This is a close call, and the undersigned does not take the battery on Mageria lightly. But

6    drawing all reasonable inferences in plaintiff's favor, eight body blows by a large C/O to a

7    prisoner who was handcuffed and paralyzed from the waist down, even in the face of that

8    prisoner's resistance, is not the type of measured response identified in clearly established law.

9    See Whitely, 475 U.S. at 322 ("Unless it appears that the evidence, viewed in the light most

10   favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain .

11   . . the case should not go to the jury."); Martinez, 323 F.3d at 1183 (stating it was "clearly

12   established by 1994" that "'the unnecessary and wanton infliction of pain . . . constitutes cruel

13   and unusual punishment forbidden by the Eighth Amendment.'" (quoting Hudson, 503 U.S. at

14   5)); Covington v. Fairman, 123 Fed. App'x 738, 741 (9th Cir. 2004) (affirming denial of qualified

15   immunity, finding that, if true, under plaintiff's version of events, the beating was "out of

16   proportion to Plaintiff's resistance" and "amounted to a wanton beating in violation of the Eighth

17   Amendment, even though it did not result in serious, lasting injury."). "Even when a prisoner's

18   conduct warrants some form of response, evolving norms of decency require prison officials to

19   use techniques and procedures that are both humane and restrained." Madrid, 889 F. Supp. at

20   1254 (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)).

21        For these reasons, the undersigned finds that defendant Branion is not entitled to qualified

22   immunity. Although plaintiff's excessive force claim against Branion should proceed, as with his

23   claim against defendant Strope, plaintiff's damages are again likely to be limited by the de

24   minimis nature of his injuries. Wilkins, 559 U.S. at 40.

25        **III.    Whether Plaintiff Exhausted the Failure-to-Intervene Claim**

26             **A. Legal Standard**

27        Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with

28   respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner

1  confined in any jail, prison, or other correctional facility until such administrative remedies as are

2  available are exhausted."  42 U.S.C. § 1997e(a); see also Merchant v. Corizon Health, Inc., 993

3  F.3d 733, 742 (9th Cir. 2021) ("Before challenging prison conditions under Section 1983, a

4  prisoner must exhaust 'such administrative remedies as are available.'" (quoting 42 U.S.C. §

5  1997e(a))).  Exhaustion is required regardless of the type of relief sought and the type of relief

6  available through administrative procedures.  Booth v. Churner, 532 U.S. 731, 741 (2001).  The

7  exhaustion requirement applies to all claims relating to prison life that do not implicate the

8  duration of the prisoner's sentence.  See Porter v. Nussle, 534 U.S. 516, 532 (2002).

9       "[T]o properly exhaust administrative remedies prisoners 'must complete the

10  administrative review process in accordance with the applicable procedural rules'—rules that are

11  defined not by the PLRA, but by the prison grievance process itself."  Jones v. Bock, 549 U.S.

12  199, 218 (quoting Woodford v. Ngo, 548 U.S. 81, 88 (2006)); see also Reyes v. Smith, 810 F.3d

13  654, 657 (9th Cir. 2016) ("[I]t is the prison's requirements, and not the PLRA, that define the

14  boundaries of proper exhaustion" (quoting Jones, 549 U.S. at 218)).  An untimely or otherwise

15  procedurally defective grievance will not satisfy the exhaustion requirement.  See Woodford, 548

16  U.S. at 90.  However, a grievance need not (1) include legal terminology or legal theories unless

17  they are in some way needed to provide notice of the harm being grieved; nor (2) contain every

18  fact necessary to prove each element of an eventual legal claim.  Griffin v. Arpaio, 557 F.3d

19  1117, 1120 (9th Cir. 2009).

20       Failure to exhaust is an affirmative defense that defendants must raise and prove.  Albino

21  v. Baca, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc) (quoting Jones, 549 U.S. at 204).  "If

22  undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust,

23  a defendant is entitled to summary judgment under [Federal Rule of Civil Procedure] 56."  Id. at

24  1166.  "If material facts are disputed, summary judgment should be denied, and the district judge

25  rather than a jury should determine the facts [relevant to exhaustion]."  (Id.)

26  **B.  Analysis**

27       Defendants Abraham, Arciga, Farhat, Reyes, Thomas, and Sarai first move to dismiss

28  plaintiff's failure-to-intervene claim on administrative exhaustion grounds.  When moving for

26

1  summary judgment on a failure to exhaust,

2      a defendant must first prove that there was an available administrative remedy and
       that the prisoner did not exhaust that available remedy. … Then, the burden shifts
3      to the plaintiff, who must show that there is something particular in his case that
       made the existing and generally available administrative remedies effectively
4      unavailable to him by showing that the local remedies were ineffective,
       unobtainable, unduly prolonged, inadequate, or obviously futile. … The ultimate
5      burden of proof, however, remains with the defendants.

6

7  Williams v. Paramo, 775 F.3d 1182, 1191 (9th Cir. 2015) (citing Albino, 747 F.3d at 1168).

8      Defendants admit plaintiff exhausted his excessive force claims but assert that his

9  grievances did not give the prison adequate notice of his failure-to-intervene claims.  (ECF No.

10 57-1 at 10-12.)  "[A] grievance suffices if it alerts the prison to the nature of the wrong for which

11 redress is sought."  Griffin, 557 F.3d at 1120.  "To provide adequate notice, the prisoner need

12 only provide the level of detail required by the prison's regulations."  See Sapp v. Kimbrell, 623

13 F.3d 813, 824 (9th Cir. 2010) (citing Jones, 549 U.S. at 218).  The relevant regulation here is Cal.

14 Code Regs., tit. 15, § 3482 (eff. Jun. 1, 2020), which requires a claimant to "describe all

15 information known and available . . . regarding the claim, including key dates and times, names

16 and titles of all involved staff members (or a description of those staff members), and names and

17 titles of all witnesses, to the best of the claimant's knowledge."

18     Defendants offer the declaration of CHCF Grievance Coordinator S. DeJesus ("DeJesus

19 Decl.", ECF No. 57-5), who identified five total records relevant to plaintiff's exhaustion efforts:

20 **(1) Grievance #44784, Sept. 22, 2020**. (DeJesus Decl., Exh. 1, ECF No. 57-5 at 4-6.)

21 Plaintiff claims he was "assaulted" and "framed" by C/Os and requests a full investigation.  He

22 states C/O Merrifield entered his cell and placed him in handcuffs so that Nurse Mageria could

23 treat his bed sore.  C/O Merrifield struck Nurse Mageria with the armrest of plaintiff's wheelchair

24 after a verbal altercation.  C/Os then appeared in plaintiff's cell "in numbers" and beat him.

25 **(2) Response to Grievance #44784, Nov. 25, 2020**.  (DeJesus Decl., Exh. 2, ECF No. 57-5 at

26 7-17.)  The response stated CHCF found no violations of CDCR policy with respect to the issues

27 raised in the grievance.  It directed plaintiff to submit his staff complaint to OOA if he wished to

28 grieve the decision and advised that this appeal would exhaust administrative remedies.

**(3) Appeal of Grievance #44784, Dec. 30, 2020.**  (DeJesus Decl., Exh. 3, ECF No. 57-5 at 18-20.)  In his appeal, plaintiff complained of excessive force, inadequate medical care, and "bad living conditions."  He directs the OOA to medical tests ordered at CHCF and Corcoran State Prison (where he transferred to after the incident).

**(4) Appeal Response, Mar. 1, 2021.**  (DeJesus Dec., Exh. 4, ECF No. 57-5 at 21-23.)  OOA determined CHCF did not address all of the allegations in plaintiff's grievance.  It ordered CHCF to open a new grievance to address all of the grievance allegations and advised plaintiff that its decision exhausts the administrative remedies available within CDCR.

**(5) Grievance #115024 Response, Jun. 23, 2021**.  (DeJesus Decl., Exh. 5, ECF No. 57-5 at 24-27.)  Plaintiff's follow-up grievance was given log #115024.  It addresses plaintiff's allegation that C/O Merrifield beat Nurse Mageria, which appears to be the issue that OOA believed CHCF did not investigate.  CHCF disapproved the grievance, finding "no indication that staff acted out of there scope of their duties."  The response further advised plaintiff to appeal to OOA if he was dissatisfied with the decision.  DeJesus attests that plaintiff did not appeal this decision.  (DeJesus Decl. ¶ 3, ECF No. 57-5 at 3.)

Having carefully reviewed the documents, the undersigned concludes plaintiff did not give the prison sufficient notice of his failure-to-intervene claims.  Plaintiff's grievance and appeal substantively allege only excessive force and inadequate medical care.  The closest allegation is that an unnamed sergeant warned his fellow "green wall" brothers to stop because medical personnel were watching.[11]  (ECF No. 57-5 at 6.)  But plaintiff does not accuse the medical personnel of failing to intervene or any other wrongdoing.  Moreover, the follow-up investigation ordered by OOA looked not into staff's failure to intervene, but the allegation that Merrifield, and not plaintiff, struck Mageria.  Because plaintiff's grievances and appeals contain no facts from which CHCF could have reasonably inferred its staff's failure to intervene was an issue, defendants have shown plaintiff did not exhaust administrative remedies.

The burden shifts to plaintiff to show administrative remedies were effectively

---

[11]  Plaintiff repeated this allegation in his complaint and cited it as an example that "the beating was fully condoned" by that unnamed sergeant.  (ECF No. 1 at 6.)

1  unavailable.  Because plaintiff did not oppose defendants' motion, the undersigned again looks to

2  the record.  Plaintiff attached the same March 1, 2021, grievance response to his complaint (ECF

3  No. 1 at 23-24) but does not address exhaustion elsewhere in his filings.  He confirmed in his

4  deposition that he filed only one grievance, #44784, related to the assault.  (Wong Decl., Exh. 10,

5  ECF No. 57-3 at 98 ("I only need to exhaust it once because that was the assault.  That's the one

6  from my lawsuit, the assault.").  Plaintiff testified he later filed a grievance about Corcoran State

7  Prison's failure to video record his injuries, but that it was unrelated to the assault.  (Id.)  In sum,

8  there is no evidence in the record that suggests administrative remedies were effectively

9  unavailable to plaintiff.

10      Accordingly, summary judgment should be granted to defendants on plaintiff's failure-to-

11  intervene claim for failure to exhaust administrative remedies.  Because summary judgment is

12  warranted on exhaustion, the undersigned need not address defendants' merits or qualified

13  immunity arguments related to the failure-to-intervene claim.

14                                  **CONCLUSION**

15      Accordingly, IT IS HEREBY ORDERED that the Clerk of the Court shall randomly

16  assign a district judge to this action.

17      In addition, IT IS HEREBY RECOMMENDED that defendants' motion for summary

18  judgment (ECF No. 57) be GRANTED IN PART and DENIED IN PART as follows:

19      1.  Summary judgment should be GRANTED to defendants Belluomini, Bunch, Castille,

20  Dennis, McElroy, Priest, Purtle, Williams, and Bargstadt on plaintiff's Eighth Amendment

21  excessive force claim;

22      2.  Summary judgment should be DENIED to defendants Strope and Branion on plaintiff's

23  Eighth Amendment excessive force claim; and

24      3.  Summary judgment should be GRANTED to defendants Abraham, Arciga, Farhat, Reyes,

25  Thomas, and Sarai on plaintiff's Eighth Amendment failure-to-intervene claim.

26      These findings and recommendations are submitted to the United States District Judge

27  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one (21)

28  days after being served with these findings and recommendations, any party may file written

1    objections with the court and serve a copy on all parties.  Such a document should be captioned

2    "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

3    objections shall be served and filed within fourteen days after service of the objections.  The

4    parties are advised that failure to file objections within the specified time may waive the right to

5    appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

6    DATED: October 1, 2025

7

8

9    SEAN C. RIORDAN
     UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28